Joseph P. GAMBLE, Plaintiff–Appellant,

v.

GROUP HOSPITALIZATION & MEDI-CAL SERVICES, INCORPORATED, Excess Benefit Plan; Group Hospitalization & Medical Services, Incorporated, Supplemental Executive Retirement Plan, Defendants–Appellees.

No. 94–1020.

United States Court of Appeals, Fourth Circuit.

Argued July 12, 1994.

Decided Oct. 21, 1994.

**ARGUED:** Anthony John Trenga, Hazel & Thomas, P.C., Alexandria, VA, for appellant. Stephen Michael Sayers, Hunton & Williams, Fairfax, VA, for appellees. **ON BRIEF:** Attison L. Barnes, III, Hazel & Thomas, P.C., Alexandria, VA, for appellant. Robert J. Stoney, Hunton & Williams, Fairfax, VA, for appellees.

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Judge MICHAEL and Judge MOTZ joined.

## OPINION

NIEMEYER, Circuit Judge:

When Joseph P. Gamble retired under pressure on November 12, 1992, as president and chief executive officer of Group Hospitalization and Medical Services, Inc. ("Group Hospitalization"), he became entitled to a pension of $115,641 from a tax-qualified pension plan, an additional benefit of $192,348 per year from an excess benefit plan, and yet an additional benefit of $25,000 per year from a supplemental excess benefit plan. Because of large financial losses then being sustained by Group Hospitalization, the insurance commissioners in Virginia and the District of Columbia instructed Group Hospitalization not to make the payments to Gamble from the two excess benefit plans. When Group Hospitalization honored the direction and refused to make payment to Gamble of the excess benefits, paying him only the pension, he filed suit under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, alleging that the excess benefit plans were "employee pension benefit plans" covered by ERISA and that he is entitled to payment as a participant and beneficiary of the plans. He sued the plans under 29 U.S.C. § 1132 for recovery of past payments, a declaratory judgment that he is entitled to future payments, and an injunction mandating their payment. He also sued for attorney's fees under 29 U.S.C. § 1132(g)(1).

Following discovery, Gamble filed a motion for summary judgment for an award of benefits, contending that ERISA preempts any state agency's direction not to pay, and Group Hospitalization filed a cross-motion for summary judgment to dismiss the complaint, contending that the court lacked subject matter jurisdiction because the plans were excess benefit plans exempted from ERISA's coverage. The resolution of the jurisdictional issue is significant to the parties because they both believe that if the plans are covered by ERISA, ERISA's preemptive force would deny the state insurance commissioners' efforts to challenge the legitimacy of

payments based on possible executive mismanagement.

The district court denied Gamble's motion for summary judgment without prejudice to his pursuing claims for benefits under state law and dismissed the action on the ground that the excess benefit plans were not covered by ERISA and therefore claims against the plan could not rely on federal jurisdiction granted by ERISA. Limiting our consideration to the narrow jurisdictional issue, we affirm.

I

Group Hospitalization is a District of Columbia corporation that provides a variety of health insurance services and includes, as one of its divisions, Blue Cross Blue Shield of the National Capital Area. At the time Gamble retired as president and chief executive officer of Group Hospitalization, Group Hospitalization and its affiliates had sustained millions of dollars of losses and were the subject of an investigation by the United States Senate. Peter Homick, who had been appointed Group Hospitalization's interim president, testified that when he took over Group Hospitalization in 1993 the corporation was not just bleeding financially, "it was massive[ly] hemorrhaging."

In order to save the company from financial ruin, Group Hospitalization was compelled in August 1992 and again in February 1993 to enter into consent orders, first with the Virginia State Corporation Commission (Bureau of Insurance) and later with the District of Columbia Insurance Administration. The orders subjected Group Hospitalization to substantial regulatory control by the two commissioners, and limited Group Hospitalization's ability to enter into contracts or transactions or to dispense funds without the explicit authorization of the commissioners.[1]

Upon his retirement in November 1992, Gamble became eligible to receive a pension from Group Hospitalization's tax-qualified pension plan, and excess benefits of $192,348 per year from the corporation's Excess Bene-

---

1. In the spring of 1993, the Virginia Insurance Commissioner decided to defer to the regulatory authority of the Insurance Commissioner in the District of Columbia and on July 21, 1993, vacated the consent order with Group Hospitalization.

fit Plan and $25,000 per year from a Supple-mental Executive Retirement Plan ("SERP"). These two plans had been established by Group Hospitalization to supplement payments from its tax-qualified pension plan which were limited in 1984 by I.R.C. § 415, placing a statutory dollar maximum on contributions and benefits to participants in plans which receive special tax treatment. After Group Hospitalization had made one payment to Gamble under these plans, the insurance commissioners of Virginia and the District of Columbia directed Group Hospitalization not to make any further unfunded "excess benefit" payments to Gamble and another high level former executive of Group Hospitalization. Group Hospitalization accordingly refused to make further payments to Gamble and requested that Gamble return the one payment that had been made to him in December 1992, stating that the request was "based solely on [Group Hospitalization's] desire to remain in compliance with the Consent Order entered into with the Virginia State Corporation Commission, Bureau of Insurance."

In his complaint, Gamble alleged that the two excess benefit plans constitute "employee pension benefit plans" as defined by ERISA and that Gamble is a participant and beneficiary under the plans and entitled to payment in accordance with the plans' terms. He contended that as of the filing of the complaint he had, despite demands, received "neither the overdue payments nor the requested assurances" that he is entitled to payment. He demanded judgment for payment in an amount equal to past payments plus interest, a declaratory judgment that he is entitled to future payments, an injunction that the plans be ordered to make future payments, and attorney's fees.

On cross-motions for summary judgment, the court dismissed the case for lack of subject matter jurisdiction, concluding that both plans were created and maintained for the sole purpose of providing benefits in excess of the limitations imposed by I.R.C. § 415 and were therefore exempted from ERISA's

coverage. The court entered judgment in favor of the plans without prejudice to Gamble's right to pursue the claims under state law. This appeal followed.

## II

We turn first to the question of whether Group Hospitalization's Excess Benefit Plan is an "excess benefit plan" as defined by ERISA and therefore exempted from ERISA's coverage.

By explicit provision, ERISA does not apply to any excess benefit plan as defined in 29 U.S.C. § 1002(36) if the plan is unfunded. *See* 29 U.S.C. § 1003(b)(5). Under the definition given in § 1002(36), "excess benefit plan" means:

> [A] plan maintained by an employer solely for the purpose of providing benefits for certain employees in excess of the limitations on contributions and benefits imposed by section 415 of Title 26 on plans to which that section applies, without regard to whether the plan is funded.

Since the parties agree that the Group Hospitalization Excess Benefit Plan is unfunded, we must decide only whether it is maintained solely for the purpose of providing benefits in excess of the limitations imposed by I.R.C. § 415.[2] If it is, then the plan would *not* be covered by ERISA and the district court would not have had jurisdiction to award benefits under the plan.

Gamble contends that while the definition of an excess benefit plan in ERISA *requires* that the plan be maintained solely to provide benefits in excess of the limitations of I.R.C. § 415, Group Hospitalization's Excess Benefit Plan is not so restricted. He argues that the recitation in the plan that benefits *may be* limited because of I.R.C. § 415 means that the plan's purpose is not *solely* to make up for the § 415 limitations. He also contends that, notwithstanding the language of the plan, the intent of Group Hospitalization's board of trustees in adopting the Excess

---

**2.** Subject to adjustments, special limitations, and exceptions, I.R.C. § 415 provides that a plan "shall not constitute a qualified trust under section 401(a)" for special tax treatment if it pro-

vides an annual benefit greater than "$90,000, or 100 percent of the participant's average compensation for his high 3 years," whichever is lesser.

Benefit Plan was to adopt a plan that would provide excess benefits over *all federal* limitations, and not just the limitations imposed by I.R.C. § 415. And this intent, he argues, was carried into practice by the plan's administrators who applied not only I.R.C. § 415 limitations to the calculations of employee benefits, but also limitations imposed by I.R.C. § 401(a)(17), which was adopted later as part of the Tax Reform Act of 1986 and made effective in 1989.[3]

When looking at the terms of the plan itself, we cannot agree that it states as its purpose anything other than to provide excess benefits over the limitations imposed by I.R.C. § 415. The plan expressly declares as its purpose the provision of benefits in excess of limitations imposed by I.R.C. § 415:

> WHEREAS, benefits payable by [the tax qualified plans] ... may be limited because of the provisions of Section 415 of the Internal Revenue Code of 1954 ... [Group Hospitalization] hereby adopts the Excess Benefit Plan effective April 1, 1986.

The same introductory provisions of the plan express Group Hospitalization's wish

> to recognize fully the services rendered by the Participants and mitigate the effect on the Participants of the aforesaid limitation [by § 415] of benefits and contributions by providing them with certain supplemental benefits.

The intent of computing the excess benefit solely to make up for I.R.C. § 415 limitations is manifested further in § 1.1 of the plan, which explicitly references I.R.C. § 415 in setting forth the nature of the calculations that are to be made. Finally, the plan states that "benefits payable under this Plan shall be paid by [Group Hospitalization] out of its general assets and shall not be funded in any manner." As noted above, ERISA's exemption for excess benefit plans requires that the plan be unfunded. Thus, on the face of the plan document alone, it appears that the plan was created solely for the purpose of providing benefits in excess of the limitation imposed by I.R.C. § 415, and that the plan is unfunded, thus meeting the dual conditions for exemption under 29 U.S.C. § 1003(b)(5). Going no further, therefore, the excess benefit plan as created would be exempt from ERISA coverage and any claim against such a plan could not rely on ERISA for jurisdiction.

Gamble argues, nevertheless, that any interpretation which concludes from the terms of the plan that it was limited to providing benefits to make up only for losses caused by I.R.C. § 415 is based on a "scrivener's error" and that the Excess Benefit Plan was, in fact, adopted for the broader purpose of providing benefits in excess of *all federal and state limitations,* and not just the limitations of I.R.C. § 415. In support of this argument Gamble directs us to the minutes of the executive committee which recommended implementation of the plan, the board's minutes recording the adoption of the recommendation, and the subsequent calculations made by the accountants determining the amount of benefits to be paid under the Excess Benefit Plan. We will briefly review this record, the nature and extent of which are not disputed.

After the Tax Code was amended in 1984 to impose limitations through I.R.C. § 415 on the amount of pension benefits that a corporation could pay from a tax-qualified plan, Group Hospitalization's outside counsel, Pierson, Ball & Dowd, proposed to Group Hospitalization an unfunded excess benefit arrangement. The arrangement would make up for losses that Gamble, then Group Hospitalization's CEO, would sustain as the result of the limitations imposed by the new I.R.C. § 415. Pierson, Ball & Dowd pointed out that the arrangement had to be unfunded "to avoid current tax to [Gamble]."

The recommendation of Pierson, Ball & Dowd was presented to Group Hospitalization's executive committee and later to its board of trustees, both of which accepted the recommendation to establish a supplemental

---

**3.** As originally enacted, section 401(a)(17)(A) provided in relevant part:

> A trust shall not constitute a qualified trust under this section [for special tax treatment] unless, under the plan of which such trust is a

part, the annual compensation of each employee taken into account under the plan for any year does not exceed $200,000.

That amount was decreased in 1993 to $150,000.

benefit plan to make up for the loss resulting from I.R.C. § 415. Instead of referring to § 415, however, the minutes of the Executive Committee meeting referred to "federal or state limitations."

Following the corporate approval, Pierson, Ball & Dowd were then asked to prepare a draft of an executive benefit arrangement to "make-up" pension benefits denied Gamble "as a result of the dollar limits on contributions/benefits set by federal pension laws— so-called excess benefits." At the time, only I.R.C. § 415 provided the limitations being discussed. While Pierson, Ball & Dowd prepared a draft arrangement to be executed by Gamble and Group Hospitalization, the firm recognized that Group Hospitalization's board also authorized similar benefits for any other employee whose pension would be limited by § 415 and advised that the draft could be used as a model form for everyone. Thus the draft forwarded by outside counsel was aimed solely at I.R.C. § 415, the only pension law limitation at the time, and Group Hospitalization's in-house counsel, in preparing a plan document, subsequently adapted the draft for all persons affected, not just Gamble. Clearly there was no scrivener's error in limiting the terms of the plan to the limitations of I.R.C. § 415. While the executive committee and the board used generalized language of "federal or state limitations" in approving the proposal, the proposal to the board arose solely out of the enactment of the I.R.C. § 415 limitations and the plan actually adopted focused only on that statutory provision.

After Group Hospitalization adopted the plan on April 1, 1986, the tax laws were further amended to impose an additional limitation in I.R.C. § 401(a)(17), limiting the amount of compensation ($200,000 at the time) that could be used in calculating pension benefits from a tax-qualified pension plan. Whether or not Group Hospitalization's Excess Benefit Plan took that limitation into account, benefits that were paid nevertheless had to adhere to the new limitation.[4] Thus, even if the calculations for de-

termining benefits had to take I.R.C. § 401(a)(17) limitations into account, the Excess Benefit Plan itself remained aimed solely at I.R.C. § 415 and was never amended to provide otherwise.

The record contains later correspondence that supports only this conclusion. There was a suggestion in correspondence that perhaps the Excess Benefit Plan should be amended to reflect the new I.R.C. § 401(a)(17) limitations, but that suggestion was deferred until Congress amended ERISA to change the definition of "excess benefit plan." It also appears that in-house counsel for Group Hospitalization gave an opinion in December 1992 that the Excess Benefit Plan could be administratively amended to conform to the "original intent" of the plan's authors which the in-house counsel concluded was to take account of all "federal and state limitations." However, that in-house counsel was not at the meeting when the plan was adopted, nor did he participate in the formulation or adoption of the plan. He acknowledges that he drew the conclusions solely from the language of the minutes, which we have already discussed.

Thus, while Gamble argues that the plan contained a scrivener's error when it was drafted to limit its purpose to make up for the shortfall created by I.R.C. § 415, all of the evidence suggests otherwise. In addition to the facts in the record which clarify the original reason for adopting the plan, the evidence shows that when I.R.C. § 401(a)(17) was added to the Tax Code, Group Hospitalization asked its outside counsel, Pierson, Ball & Dowd, whether the Excess Benefit Plan took into account the new I.R.C. § 401(a)(17) limitation. Responding to the question in an opinion letter dated March 4, 1987, Pierson, Ball & Dowd stated:

> Prior to the 1986 Tax Reform Act of 1986, the only pension law limits on the amount of allowable benefits and contributions were contained in Section 415 of the Internal Revenue Code. Thus, the ERISA provision which authorizes so-called un-

---

4. It is forcefully argued by Group Hospitalization that no excess retirement benefit was ever limited by I.R.C. § 401(a)(17) since the limitations of I.R.C. § 415 always required a lesser payment.

While Gamble disputes this, we need not resolve the issue, because of our finding that the plan was never amended to accommodate § 401(a)(17) limitations.

funded excess benefit plans speaks only of arrangements which provide benefits and/or contributions which are in excess of the allowable Section 415 limits. *And the plan which we prepared tracks that definition and only supplements benefits and contributions which are lost because of the Section 415 limits* (see Section 1.1 of the Excess Benefit Plan.)

For any number of reasons, the $200,000 compensation ceiling was not placed on Section 415 of the Internal Revenue Code. Instead, it is found in Section 401(a)(17). Consequently, *neither the ERISA definition of excess benefit plan, nor the plan which we prepared address themselves to benefits or contributions which are lost not because of Section 415 limits, but as a result of the new compensation dollar limit.*

The dollar limitation will not take effect until 1989. I am confident that prior to that time Congress will become aware of the need to revise the ERISA definition to take into account the benefit and contribution consequences of the compensation limit; and will revise the law to permit excess benefit plans to make up benefits or contributions which are lost because of both the compensation and limits. *Once that is done, we can then revise the excess benefit plan document accordingly.*

(Emphasis added). This document establishes without any doubt that the scrivener, Pierson, Ball & Dowd, fully intended to aim the Excess Benefit Plan at I.R.C. § 415 and explains further that the plan does not, as written, take into account other limitations and would need to be amended to do so. Notwithstanding this full explanation in March 1987, less than a year after the adoption of the plan, Group Hospitalization never undertook to amend the Excess Benefit Plan to take into account limitations imposed by I.R.C. § 401(a)(17). Moreover, the failure to incorporate the limitations imposed by I.R.C. § 401(a)(17) was recognized by the board in a meeting some two years later, after which the board still took no action to amend the plan. Since Group Hospitalization was fully advised and proceeded to remain with the existing limitation of the plan, which makes up only for the losses caused by I.R.C. § 415,

we can only reach the conclusion that this is the sole purpose of the Excess Benefit Plan in this case.

When persons with the power to amend a plan come to recognize that it needs to be amended to reflect a change of circumstances, that recognition alone does not effect an amendment of the plan, even though that may have been their firm intent. Until the plan is in fact amended, intent to do so is nothing more than that, and the plan's terms remain as written. Both state law and ERISA cases manifest a strong policy that plans be in writing, and for good reason. The parties and beneficiaries should be entitled to plan their financial affairs with some certainty about that to which they are entitled, and fiduciaries should be guided clearly in the administration of plans by a definitive writing and not by the vagaries of oral understandings. *See, e.g., Gable v. Sweetheart Cup Co.,* 35 F.3d 851, 857 (4th Cir. 1994) (observing that informal communications outside of formal plan documents cannot govern a company's ERISA obligations because otherwise plan documents would no longer ensure necessary predictability).

In light of the foregoing, we can only conclude that the Excess Benefit Plan adopted by Group Hospitalization on April 1, 1986 is an "excess benefit plan" as defined by ERISA and therefore is exempted from ERISA's coverage. *See* 29 U.S.C. § 1003(b)(5).

### III

■ The district court also concluded that the Supplemental Executive Retirement Plan ("SERP"), entitling Gamble to an additional retirement benefit of $25,000 each year, was an excess benefit plan exempted from the coverage of ERISA. The court observed that Gamble failed to establish that the SERP "has been maintained other than for the purpose of providing benefits in excess of I.R.C. § 415," and additionally, that the burden of establishing subject matter jurisdiction rested with Gamble. Since Gamble failed to present evidence that this plan was anything other than an excess benefit plan as defined by 29 U.S.C. § 1003(b)(5), he failed

to carry his burden of demonstrating federal subject matter jurisdiction, particularly in light of Group Hospitalization's affirmative evidence that the SERP was such an excess benefit plan.

According to Gamble, the SERP was an informal arrangement established by the board of trustees for him alone, and there is no formal document to evidence it. Minutes from the meetings of Group Hospitalization's executive committee and board of trustees are the only documents in the record that refer to the supplemental plan for Gamble. Gamble himself was not present at the meetings when the plan was approved because, as he testified, it was his policy to leave the room when the board voted on matters relating to his compensation.

The October 1986 minutes of the executive committee state that the executive committee voted to:

> [R]ecommend to the board of trustees of [Group Hospitalization] that a Supplemental Executive Retirement Plan be implemented for the existing Chief Executive Officer[Gamble] ... and, further, that the details of this plan would be finalized by the Executive Committee.

Although this recommendation was accepted by the board of trustees on November 11, 1986, the minutes in evidence do not reveal any further discussion or details about the plan or its terms. However, Benjamin W. Giuliani, Gamble's successor as president and chief executive officer and corporate secretary at the time Gamble's SERP was approved, testified that the purpose of the SERP for Gamble was "to provide benefits to him in excess of the limitations on contributions and benefits imposed by section 415 of the Internal Revenue Code of 1986 and thereby to act as an incentive for him to continue in the employ of [Group Hospitalization]." This was the only evidence presented on this issue.

In 1987 the board voted to "restructure" Gamble's SERP "to mirror" the terms of individual excess benefit agreements signed by five other top executives. These other executive benefit agreements provided that they were put in place because benefits payable by the qualified pension plan "may be limited by applicable provisions of the Internal Revenue Code of 1986." Each of these excess benefit agreements was expressly unfunded and each stated that the payment made to beneficiaries would be "paid by [Group Hospitalization] out of its general assets." Whether these other plans were exempted from ERISA, however, is irrelevant because Gamble's own SERP was never restructured to mirror these other individual excess benefit agreements, nor was any document ever signed by Gamble to evidence his SERP.

Given the record before us, we can find no error in the district court's conclusion that the SERP was also an excess benefit plan exempt from ERISA's coverage.

## IV

■ The provision in ERISA that exempts unfunded excess benefit plans leaves claims against such plans to be paid directly from the employer's assets. Since ERISA does not substantively regulate such plans, its preemptive force does not oust state law. *See Bartholet v. Reishauer A.G. (Zurich),* 953 F.2d 1073, 1077 (7th Cir.1992). Thus, Gamble's claims for benefits under the Excess Benefit Plan and the Supplemental Executive Retirement Plan may be made under state law, and our decision today, that the district court was correct in recognizing that it did not have subject matter jurisdiction, is not intended to imply any ruling on the merits of those state law claims. The judgment of the district court is

*AFFIRMED.*